**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

DAVID WEITZMAN, M.D.,           )
                                )
           Plaintiff,           )
                                )
     v.                         )     1:17CV82
                                )
UNITED STATES OF AMERICA,       )
                                )
           Defendant.           )

**MEMORANDUM OPINION AND ORDER**

Plaintiff David Weitzman, M.D. filed this personal injury action against Defendant United States of America ("United States" or "Government") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq. (Compl. [Doc. #1].) The United States has moved for summary judgment, (see Mot. for Summ. J. [Doc. #20]), on the basis that the FTCA does not waive sovereign immunity as to this action because the North Carolina Workers' Compensation Act ("NCWCA"), N.C. Gen. Stat. § 97-1 et seq., is Weitzman's exclusive remedy, (Def.'s Br. in Supp. of Mot. for Summ. J. ("Br. in Supp.") [Doc. #21]). For the reasons that follow, the Motion is denied.

I.

On March 24, 2015, while working as a primary care locum tenens physician at the VA Hillandale Road Clinic 1 ("the Hillandale Clinic") in Durham, North Carolina, Weitzman was injured when a desk chair collapsed as he sat down in it. (See Decl. of James Galkowski (Jan. 16, 2018), Ex. 1 to Br. in Supp. [Doc. #21-2]; N.C. Indust. Comm'n Notice of Accident & Order Approving Agreement,

Ex. 3 to Br. in Supp. [Doc. # 21-5].) Weitzman first filed a claim with the United States Department of Labor seeking compensation through the Federal Employees' Compensation Act ("FECA"), but he was found not to be a "civil employee" as that phrase is defined by 5 U.S.C. § 8101(1) for purposes of coverage under FECA. (U.S. Dep't of Labor Notice of Decision, Ex. 2 to Corrected Br. in Resp. to Def.'s Mot. for Summ. J. ("Br. in Resp.") [Doc. #25-1].)

He then filed a claim with the North Carolina Industrial Commission seeking compensation through North Carolina's Workers' Compensation Act, according to which he was awarded $8,000.00. (N.C. Indust. Comm'n Notice of Accident & Order Approving Agreement.) Before the North Carolina Industrial Commission approved the Agreement for Final Compromise Settlement and Release, Weitzman filed the instant action against the United States alleging negligence and seeking $280,000.00 in damages, fees, and costs. (Compl.)

The parties agree that if Weitzman is found to be an employee of the United States, summary judgment must be granted because, as explained below, the United States will not have waived immunity from this suit. (See Br. in Resp. at 5 ("If Dr. Weitzman was an employee of the VA, he is precluded from recovering on a third party claim".) & Reply in Supp. of Mot. for Summ. J. at 1 [Doc. #27] ("The parties agree that if North Carolina's borrowed servant doctrine applies, the Court should grant the United States' motion and dismiss the action.").) Thus, the issue is whether, at the time of his accident, Weitzman was an employee of the United States.

2

II.

The following facts are undisputed. In 2014, the United States Department of Veterans Affairs Medical Center in Durham, North Carolina ("the Durham VA") solicited a contract for temporary staffing of physicians or other health care providers referred to as locum tenens. (Decl. of Galkowski ¶¶ 2, 3.) Next Medical Staffing LLC ("NMS"), a temporary medical staffing agency, was awarded the contract (referred to as the "VA-NMS Contract"). (Id. ¶ 4.)

In the VA-NMS Contract, the Durham VA required locum tenens physicians to provide appropriate medical treatment and management of general medical problems of adult patients on site at the Durham VA Medical Center five days a week between the hours of 8:00 a.m. and 4:00 p.m., manage at least fourteen thirty-minute appointment slots per day, see a mixture of new and established patients with new patient appointments lasting sixty minutes, refer to specialty clinics within the VA system, and not refer to outside providers unless reviewed by staff and authorized by the Chief of Ambulatory Care. (VA-NMS Contract §§ B.4, B.6; see also Decl. of Galkowski ¶ 9.)

The Durham VA also required the locum tenens physicians to conduct a primary evaluation of applicants for care, perform and record medication reconciliation for each encounter, obtain appropriate consultation from on-call specialists, enter all reports for incorporation into the computer patient record system the day of the visit, complete and sign notes within twenty-four hours of an encounter, satisfy Veterans Health Administration and medical center policies,

3

prescribe medications for patients according to the established drug formulary at the facility, and perform services within the VA policies and procedures and regulations of the medical staff bylaws of the facility. (VA-NMS Contract § B.4; see also Decl. of Galkowski ¶ 9.)

In or around September 2014, the Durham VA asked NMS to provide candidates to fill locum tenens physician openings, including one at the Hillandale Clinic, an outpatient primary care clinic. (Id. ¶ 5.) NMS proposed Weitzman as a candidate for the opening at the Hillandale Clinic, and, per the VA-NMS Contract, would have submitted his qualifications to the Durham VA, which had the right to review candidates. (Id. ¶¶ 5, 10 (citing VA-NMS Contract § B(4)(2), Ex. 1-A to Br. in Supp. [Doc. #21-1]).) Specifically, the Associate Chief of Staff for Ambulatory Care Services for the Durham VA, Dr. Brian Hayes, handled the review and final acceptance of approved locum tenens physicians. (Id. ¶ 6.) Once a physician was accepted, the Durham VA coordinated with NMS for the locum tenens physicians to obtain VA credentials and privileges. (Id. ¶ 7 (citing VA-NMS Contract §§ B(4)(2)(b), B(6)).) This process – the same for regular VA staff physicians – included a background check, fingerprinting, and confirmation of citizenship. (Id.) Dr. Hayes and VA credentialing specialists reviewed all applications for credentials and privileges, and the Durham VA Physician Professional Standards Board also specifically reviewed the applications of physicians. (Id. ¶ 8.)

The Durham VA approved Weitzman for locum tenens work at the Hillandale Clinic, after which he signed a Physician Confirmation with NMS for the

assignment and began work as a primary care physician. (Id. ¶ 11 (citing NMS Physician Confirmation & Provider Service Agreement (Sept. 2, 2014), Ex. 1-B to Br. in Supp. [Doc. #21-3]).)

According to the NMS Provider Services Agreement entered into between Weitzman and NMS, the Durham VA was "solely responsible for determining [Weitzman's] work assignments, schedule, number of hours worked[,] and patients served" and Weitzman was required to cooperate with the Durham VA's orientation requirements. (NMS Physician Confirmation & Provider Service Agreement at 3[1], 4; see also Decl. of Galkowski ¶¶ 13, 14.) The Durham VA determined Weitzman's actual work hours, days off, and lunch and break times. (Decl. of Galkowski ¶ 19.) It also had the right to terminate his assignment with or without cause. (Id. ¶ 22 (citing NMS Physician Confirmation & Provider Service Agreement at 4).) The Durham VA's Contracting Officer was to "deal with issues raised concerning contract personnel's conduct" and served as the "final arbiter on questions of acceptability". (VA-NMS Contract § B.6.)

To facilitate Weitzman's work as a locum tenens primary care physician at Hillandale Clinic, the Durham VA provided him all necessary tools including exam rooms and tables, vital signs monitoring equipment, scales and other measurement devices, eye charts, computers, otoscopes and ophthalmoscopes, a stethoscope if

---

[1] Page numbers associated with the NMS Physician Confirmation and Provider Service Agreement are those created by ECF, as the first page of the filed document is not numbered, while the second page of the filed document is numbered page 1.

5

not provided by Weitzman, magnification devices, all disposable medical supplies like tongue depressors, bandages, gauze, speculums, and gloves, procedure trays for suturing, incisions, and drainage, vaccinations and related equipment, point of care lab testing supplies, and dictation equipment. (Decl. of Galkowski ¶ 16.)

The Durham VA also provided Weitzman with a support staff whom he had no authority to hire or fire. (Id. ¶ 17.) Dr. Chinwe N. Chukwurah, Medical Director of the Hillandale Clinic, and a nurse practitioner supervised his work. (Id. ¶ 18; Dep. of David Mark Weitzman, MD 12:4-21 (Nov. 30, 2017), Ex. 2 to Br. in Supp. [Doc. #21-4].) The Durham VA required Weitzman to keep and produce timecards which were reviewed by Durham VA employees before being sent to NMS for processing and payment. (Decl. of Galkowski ¶ 21.) He and the Durham VA negotiated through NMS his hourly wage. (Id. ¶ 20 (citing NMS Physician Confirmation & Provider Service Agreement at 2).) The Durham VA paid NMS $140.00 per hour for his services ($175.00 per hour for overtime), and NMS in turn paid him $100.00 per hour ($135.00 per hour for overtime). (Id. ¶ 20 (citing VA-NMS Contract § B.3, NMS Physician Confirmation & Provider Service Agreement at 1).)

While the United States set the details of Weitzman's work, it expressly disavowed control over his medical decisions. Although the Durham VA could "evaluate the quality of professional and administrative services provided", it "retain[ed] no control over professional aspects of the services rendered, including by example, the Contractor's or its health-care providers' professional medical

6

judgment, diagnosis, or specific medical treatments." (VA-NMS Contract § C.7.) NMS was responsible for supervising the daily services provided under the contract by Weitzman. (Id. § B.6.8.) Furthermore, Weitzman was "not covered by the Federal Tort Claims Act", and if he were "identified as a provider in a tort claim, . . . [a]ny settlement or judgment . . . [would be] the responsibility of the Contractor and/or [its] insurance carrier." (Id. § 11.) Similarly, elsewhere in the VA-NMS Contract, the Durham VA required Weitzman to maintain his own professional liability insurance, and "[t[he Contractor and its health-care providers", not the Government, were "liable for their liability-producing acts or omissions." (Id. § C.7.) The VA-NMS Contract specifically provides that it is a non-personal services contract, per Federal Acquisition Regulation 37.101 which defines such a contract as one "under which the personnel rendering the services are not subject, either by the contract's terms or by the manner of its administration, to the supervision and control usually prevailing in relationships between the Government and its employees", 48 C.R.F. 37.101. (VA-NMS Contract § C.7.) The parties "expressly agreed and understood" that "the professional services rendered by the Contractor or its health-care providers [were] rendered in its capacity as an independent contractor." (Id.)

III.

"Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,' Fed. R. Civ. P.

56(a)." Groves v. Commc'n Workers of Am., 815 F.3d 177, 181 (4th Cir. 2016). The moving party bears the initial burden of establishing "the basis for its motion[] and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)[2]). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A dispute is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Id. at 248. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. Id.

The United States is immune from suit unless it consents to suit by waiving its sovereign immunity. See United States v. Testan, 424 U.S. 392, 399 (1976). "Under the Federal Torts Claim Act[,] the United States waives sovereign immunity for tortious acts for which a private individual would be liable in similar circumstances." Russ v. United States, 129 F. Supp. 2d 905, 908 (M.D.N.C. 2001) (citing 28 U.S.C. §§ 1346(b), 2671-80), aff'd, 33 F. App'x 666 (4th Cir. 2002). Specifically, 28 U.S.C. § 1346(b)(1) permits

---

[2] Rule 56(c) was amended effective December 1, 2010, but the substance of the rule did not change.

8

> civil actions on claims against the United States, for money damages, . . . for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

In other words, if a private employer would be liable for Weitzman's injury under similar circumstances, then so, too, is the United States. If a private employer would not be liable under similar circumstances, then neither is the United States.

The Government argues that a private employer would not be liable to Weitzman for negligence, because, under North Carolina law, an employee's exclusive remedy for an injury sustained on the job, with the exception of a <u>Woodson</u> action not applicable here, is pursuit of a claim under the NCWCA. (Br. in Supp. at 16.) According to the United States, Weitzman is a borrowed servant under North Carolina law and, therefore, an employee for purposes of determining coverage of the NCWCA. (<u>Id.</u> at 10-20.) Pursuant to the NCWCA's exclusivity provision, he is barred from pursuing a negligence action and is, instead, limited to a workers' compensation claim. Because a private employer would not be liable for negligence under these circumstances, neither is the Government. Therefore, under these facts, the FTCA does not serve to waive the United States' sovereign immunity from suit. (<u>Id.</u> at 20.)

In response, Weitzman argues that "[l]ogic, fairness, a basic sense of justice and sound public policy should preclude the government from 'having its cake and eating it too'". (Br. in Resp. at 6.) "Having denied that Dr. Weitzman was entitled

to workers' compensation benefits, and disavowing any responsibility or control over his conduct in the relevant documents, [the Government] should not be allowed to escape the ambit of the Federal Tort Claims Act." (Id.)

However, the question is not whether Weitzman was a federal employee for purposes of FECA coverage – as it was for the Secretary of Labor assessing Weitzman's claim. (See U.S. Dep't of Labor Notice of Decision.) Nor is the question whether Weitzman was an independent contractor or federal employee for purposes of determining the Government's liability for his tortious acts – as the VA-NMS Contract in part addresses. (See, e.g., VA-NMS Contract § C.7.) Instead, the question is whether, under North Carolina law, Weitzman was a borrowed servant of the United States for purposes of determining NCWCA coverage. See 28 U.S.C. § 1346(b)(1) (determining liability to the claimant "in accordance with the law of the place where the act or omission occurred").

"[T]he North Carolina Workers' Compensation Act was created to ensure that injured employees receive sure and certain recovery for their work-related injuries without having to prove negligence on the part of the employer or defend against charges of contributory negligence." Whitaker v. Town of Scotland Neck, 597 S.E.2d 665, 667 (N.C. 2003). "In exchange for these limited but assured benefits, the employee is generally barred from suing the employer for potentially larger damages in civil negligence actions and is instead limited exclusively to those remedies set forth in the Act." Id. (internal quotation omitted) (recognizing the narrow and fact-specific Woodson exception to the exclusivity provision when

10

an employer's acts are intentional or substantially certain to cause serious injury or death).

Of course, the NCWCA only applies if there is an employee-employer relationship. The NCWCA defines an employee as "every person engaged in an employment under any appointment or contract of hire or apprenticeship, express or implied, oral or written . . . ". N.C. Gen. Stat. § 97-2(2). North Carolina courts have recognized the "borrowed servant" doctrine for purposes of the NCWCA according to which "a general employee of one can also be the special employee of another while doing the latter's work and under his control." Henderson v. Manpower of Guilford Cty., Inc., 319 S.E.2d 690, 693 (N.C. Ct. App. 1984) (recognizing that "it is fundamental that under some circumstances a person can be an employee of two different employers at the same time, in which event either employer or both may be liable for Worker's Compensation"). The "employee's receipt of workers' compensation benefits from either employer bars the employee from proceeding at common law against either of the employers." Taft v. Brinley's Grading Servs., Inc., 738 S.E.2d 741, 744 (N.C. Ct. App. 2013).

A worker is the borrowed servant of another only if "(a) the employee has made a contract of hire, express or implied, with the special employer; (b) the work being done is essentially that of the special employer; and (c) the special employer has the right to control the details of the work." Collins v. James Paul Edwards, Inc., 204 S.E.2d 873, 876 (N.C. Ct. App.), cert. denied, 206 S.E.2d 862 (N.C. 1974) (quoting 1A, Larson, Workmen's Compensation Law, § 48.00). The United

11

States focuses almost entirely on the third prong, and, in its Reply Brief, argues that Weitzman's only dispute is with the third prong. (Br. in Supp. at 12-20; Reply in Supp. at 1-4.) To the contrary, Weitzman's opposition to summary judgment is understood to contest the first prong, as well, which, as it turns out, is determinative here.

> The contract requirement is crucial because "the employee loses certain rights along with those granted when striking up a new employment relation. Most important of all, he or she loses the right to sue the special employer at common law for negligence; and . . . the courts have usually been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit."

Anderson v. Demolition Dynamics, Inc., 525 S.E.2d 471, 473-74 (N.C. Ct. App. 2000) (quoting Larson § 67.01[2]). See also Pinckney v. United States, 671 F. Supp. 405 (E.D.N.C. 1987) (describing the joint employer relationship as having "serious consequences").

Even if the worker and the special employer do not have an express contract as is the case here, they may have an implied contract with each other. The North Carolina Court of Appeals has found that, in a temporary staffing situation, an implied contract existed between the worker and the special employer "since the [worker] accepted the assignment from [the temporary staffing agency ("general employer")] and performed the work at the direction and under the supervision of [the special employer]." Brown v. Friday Servs., Inc., 460 S.E.2d 356, 360 (N.C. Ct. App. 1995). In Brown, the general employer and the special employer also had an express contract according to which the special employer would pay the general

employer which would, in turn, pay the worker. Id. at 360-61. On their face, the facts of Brown sound remarkably similar to those in the instant case. However, the express contract in Brown has been described as "silent" on whether the worker remained an employee of the general employer, see, e.g., Bullard v. Peak Steel, L.L.C., 781 S.E.2d 532, *5, *6 (N.C. Ct. App. Jan. 5, 2016) (unpublished); whereas, the VA-NMS Contract is not so silent.

Unlike in Brown, when the express contract between the general and special employers has language according to which the general employer retains the worker as its employee, then there may be no implied employment contract between the worker and the special employer. See Vetco Concrete Co. v. Troy Lumber Co., 124 S.E.2d 905, 908 (N.C. 1962) ("It is a well established principle that an express contract precludes an implied contract with reference to the same matter."). For example, in Shelton v. Steelcase, Inc., 677 S.E.2d 485 (N.C. Ct. App. 2009), although there was no express contract between the worker and the special employer, the special employer argued there was an implied contract. The court disagreed because the language in the express contract between the general and special employers suggested otherwise. Id. at 492. That contract expressly stated that the general employer's personnel would be "employees of the Contractor" and required the general employer to pay the worker, withhold her taxes, provide workers' compensation insurance, and pay her benefits. Id. The court found there to be an issue of fact as to the worker's special employment. Id.

Similarly, the court in Taft found there to be an issue of fact as to the first prong of the special employment test. 738 S.E.2d at 746. There, the contract between the general and special employers stated that "[t]he parties understand that [the general employer] is an independent contractor, and that all of the personnel assigned by [it] to [the special employer] . . . are employees of [the general employer] and only [the general employer]." Id. at 745-46. The general employer was responsible for paying employment taxes, workers' compensation insurance, salaries, and fringe benefits and for maintaining its own general liability, professional malpractice, and automobile liability insurance for its workers. Id. at 746.

Here, as in Shelton and Taft, there is a genuine dispute as to the material fact of whether or not Weitzman and the United States had an implied employment contract. On the one hand, there is no express statement in the VA-NMS Contract that NMS's employees remain its employees and its employees only. There are provisions according to which the Durham VA, for example, purports to control the details of Weitzman's work, defines the policies and procedures that govern his work, and asserts the authority to address issues raised concerning his conduct and to serve as the final arbiter on questions of his acceptability. On the other hand, for example, the VA-NMS Contract specifically provides that it is a non-personal services contract, meaning one "under which the personnel rendering the services are not subject, either by the contract's terms or by the manner of its administration, to the supervision and control usually prevailing in relationships

14

between the Government and its employees", 48 C.R.F. 37.101.  The VA-NMS Contract also expressly states that "professional services rendered by the Contractor or its health-care providers are rendered in its capacity as an independent contractor", that Weitzman is not covered under the Federal Torts Claim Act, and that the Durham VA "retains no control over professional aspects of the services rendered, including by example, the Contractor's or its health-care providers' professional medical judgment, diagnosis, or specific medical treatments."  Any liability for Weitzman's tortious acts or omissions befalls "the Contractor", which either must maintain or require its health-care providers to maintain professional liability insurance.

In sum, there is insufficient evidence to determine conclusively as a matter of law that an implied contract existed between Weitzman and the United States. Therefore, it cannot be determined as a matter of law that Weitzman is or is not a borrowed servant of the United States, nor, as a result, can it be determined as a matter of law if the United States is or is not immune from this suit.

IV.

For the reasons stated above, IT IS HEREBY ORDERED that the United States' Motion for Summary Judgment [Doc. #20] is DENIED.

This the 18th day of May, 2018.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge